May it please the court. My name is James Indicott. I represent the appellants in this case, Joe and Casey Dixon. This circuit's decisions make clear that if an expert is going to test, the test must analytically prove the expert's hypothesis. Physical tests, such as mentioned in Fireman's Fund, Pressley, Weiss-Graham, American Auto, mathematical calculations, as mentioned in Pro Service, Cangeter. Scientific research, as mentioned in Pressley and the Supreme Court in Kumho, are all acceptable methods to test in this circuit. And those methods coincide with the methods stated in NFPA 921, in which physical tests are mentioned, analytical tests by applying scientific principles are mentioned, and scientific research. Mr. Decker, Mr. Weissong, did none of these. No sifting, no test for accelerant, no extensive analysis of products or appliances, no reference to mathematical calculations or analysis, no reference to scientific principles or scientific research. Instead, they claimed to test, and they defined their testing as deductive reasoning, actually using those words, deductive reasoning, but in a way contrary to the very scientific method they purported to follow. Testing, or deductive reasoning as defined in NFPA 921, which all states cited and which the district court cited as well, is when the investigator compares the hypothesis to all known facts, as well as the body of scientific knowledge associated with the phenomena relevant to the specific incident. Testing is not, as Mr. Decker, Mr. Weissong, all state, and even the district court would have you believe, it is not the process of comparing the information available to the investigator to the investigator's body of knowledge and experience in their field. Testing is intended to be objective. It's intended to be an objective, rigorous evaluation of hypotheses. And examining the empirical data of an incident and extending out into the world from the expert to take a look at other scholars' research, calculations, tests on the same or similar issue. All state is arguing that a subjective means of examining the data is acceptable. The Supreme Court in Daubert indicated that subjective belief by an expert should be rejected. The Supreme Court in Kumho talked about the IPSA Dixit, in which an expert basically says that's just how it is, and I don't think that should have been accepted by the district court, and it should not be accepted by this court. The district court seems to be advocating for more of an insular testing, a subjective test, not only on the inductive reasoning side when you have to determine and name hypotheses, but also when you're testing. And a subjective test does not meet the requirements of Daubert and its progeny, or I don't think the requirements of this court. Now... Well, suppose the expert says I have years and years of experience in doing this, and I'm familiar with the methods in the industry or the views of the experts and so forth, and I'm comparing the situation here against that. I think in that situation the expert needs to say what it is the expert is relying on outside of the expert's own experience. What tests done by other people, in this case a fire spread test done by somebody else, is there something similar to what happened in this incident? Is there scientific research which would support that expert's analysis? Are there scientific principles that the expert can actually refer to, specifically refer to? When I took their depositions, they did not refer to any scientific principles. They did not refer to any scientific research. That's the way their depositions turned out. When they submitted their affidavits, they talked about testing and deductive reasoning at that point. Again, even in their affidavits, they did not talk about any outside information that they consulted. Do you think an expert's experience, if it's extensive enough, could constitute a body of scientific knowledge? I don't think so. I think it's the investigator's body of knowledge. I don't think it is the body of knowledge. That's why I believe the district court went awry. Did you have any evidence that their body of knowledge was inconsistent with the body of knowledge, as you're defining it? Well, we did have opportunity to present an opposition expert. There's no question about that. We had an opportunity to do that. What scientific methodology did your opposition expert use? What testing did he perform that was different or additional to the testing that was performed by the insurance company's experts? He did no testing. Exactly. Didn't he use exactly the same methodology that the experts used? No. Why not? He didn't claim to test. He didn't come out and say, I tested. And then he didn't say, not only did I test, but I tested using deductive reasoning. And I define deductive reasoning, he did not say this, he did not define deductive reasoning as something other than what is mentioned in the scientific method as an expert reviewing the data with regard to the entire body of knowledge. And so your expert can testify about these things and these theories because he never said, I used the scientific method. But if someone says, I used the scientific method, they are therefore limited in their testimony to only those things which can be consistently applied into the scientific method as it's understood commonly in the profession. I believe so. So if you say you're testing and if you say you're engaging in deductive reasoning, then I think you need to define it correctly as it's defined. And even as cited by Allstate and as cited by the district court, it... What difference does it make? I mean, you think the jury was influenced by the fact that they claimed that this was deductive reasoning? I think the jury... They would have known what that meant and given it more weight than your man? I understand that that's an issue, but expert testimony is... I mean, this court has mentioned it. The Supreme Court has mentioned it. It's just hard to understand and it can be difficult. It can be confusing. I think it makes a difference if our judge, if our district judge was confused. Oh, yeah. If our district court judge was confused after substantial briefing on this issue, I believe that it's highly likely that the jury was confused as well and went awry as much as the district court judge did. Did the district judge prohibit you from cross-examining on the theory of deductive reasoning and scientific method? No. Actually, during direct, they didn't... I don't believe that Wysong or Decker even talked about testing or deductive reasoning. I did not feel at that point, if I was crossing them, that I could get into that. I would be going beyond direct. And the fact that the... Well, why would you be going beyond direct? I think that the underlying basis and methodology for an expert's opinion is always fair game. Once you offer the opinion, aren't you free to cross-examine on the underlying methodology? I did talk about that. I did cross-examine with regard to lack of sifting and lack of examining appliances, lack of products, the fact that they couldn't say that Mr. Dixon or Mr. Hitch did it. They couldn't show cause. They couldn't show origin. So I got to... And if there was a body of scientific knowledge that you say is out there that conflicted with their so-called subjective knowledge, couldn't you have brought that up as well? I didn't think it was my burden to bring into... No, I mean to impeach them, though, to say, well, you're claiming this is the method, but there's a body of... Aren't you familiar with this body of scientific knowledge that's contrary to the way you're approaching it and so forth? I felt like the cross was sufficient to attack their methodology without getting into... If I bring in... Well, what's the problem then? Well, the problem is that I have a judge that still looked at this debriefing, looked at the notion of testing, looked at deductive reasoning, and rendered an opinion that I think was confusing and showed his confusion, and therefore I believe the jury was confused. I think the jury presented expert testimony that was not proper under the methodology requirements. So you're saying even though you could cross-examine them and you think that was adequately done, it should have been excluded entirely? It should have been excluded entirely, and I guess I sort of question what's the point of Daubert, what's the point of the analysis at all, if in every case you would simply say, well, cross-examination is okay. That's enough. Okay. There's a gatekeeping. I think I'll say... One quick question. The conclusion was what? Fast burn? Fast burn, rapid burn. Why is that so significant? Why is that significant to the case? It's not supported by any methodology. It's not supported by the facts. There's too big of an analytical gap, as this court has discussed and other courts have discussed, between the evidence and the conclusion. There's no tie-in between the evidence and that conclusion. It brings in someone with the weight of an expert to say that this is a fast burn, and it has the potential, high potential, I believe, for misleading the jury. Certainly misled the judge, I think. But what was the significance of it to show that the fire wasn't already going before your people left the house? As far as I know, the significance was to pinpoint, to try to have my people in that house when the fire either starts or is about to start. That was the point of both... But if it had been a slow burn, wouldn't your people have been in the house then, too? Could have been, and there was evidence that sometimes that happens. There's a fire burning undetected, and that happens. I thought the point was the fast burn means that it would have... It was more likely that the start occurred right when your people were leaving. Mr. Wysong refers to multiple locations, which is another issue. He has two separate hypotheses. He has one that says it started an hour or more before the witnesses saw the fire at like 9, 12, or whenever it was. And then he says, alternatively, well, it was started in multiple places. There's no connection. These guys could not determine cause. They couldn't determine origin. And their own methodology was inconsistent with their conclusions, as happened in Fireman's Fund. They said they didn't know cause, and then they said, oh, but we ruled out all these other causes, when those other causes aren't related to what their ultimate conclusion was, which was not related to causation at all. There's an inconsistency between the methodology they claimed to use and the conclusions they finally arrived at. I think I will save the rest of them. Unless there are more questions, I'll save my time. Very well. Thank you. Good morning, Your Honor. Mr. Brady will hear from you. Thank you, Your Honors, and may it please the Court. I will start off on the same issue, on the Daubert issue that we've been talking about. As the Court is aware, the standard of review here in this Court is an abuse of discretion, and Judge Harpool's ruling on this issue should not be disturbed absent an abuse of discretion. We've already heard the district court. Judge Harpool heard extensive arguments on this issue during the hearing on the motion in Lemonet before the trial, and then also the issue was argued extensively during the trial when some objections came up during the trial. You mentioned the gatekeeper function, Your Honor. Yeah, he might have heard a lot of argument, but if he got it wrong, then there's still a problem. Well, and that's what I was about to say, Your Honor, is I respectfully disagree with Mr. Endicott. I don't think that Judge Harpool was confused in any way, shape, or form. As the gatekeeper, he was in the best position to make a determination on this issue, and I believe he correctly concluded that the Dixons' arguments regarding speculation and their arguments regarding methodology all went to the weight of the evidence and could be addressed through cross-examination, could also be addressed through the testimony of the Dixons' own expert. I think he got that exactly right. So what exactly was the methodology they applied? The methodology, Your Honor, they did say that they utilized the scientific method, which is a well-accepted, and I'll go into the detail on it, but that's a well-accepted methodology in fire science and with these fire experts. What it is, Your Honor, it's observing the relevant evidence, applying their specialized knowledge on fire growth and fire spread to the evidence that they gathered, collected, reviewed. Okay, so did they testify as part of my training, I observed 33 fires and the speed with which they burn in different situations, and that sort of thing that they were running a comparison to? They did, Your Honor. I made very sure because of the pretrial issues on this that I laid a foundation. This case is a little bit different because I wasn't offering either of these gentlemen to testify about the origin and cause of the fire. What I was offering them for here was to testify regarding fire growth and fire spread. There is an indicator in 921. One of the things 921 says is abnormal, excessive, unnatural fire growth can be an indicator of an incendiary fire. But to get back to your question, so yes, the foundation I laid was these gentlemen had participated in live burns where they had opportunities to observe the way fires burn, the way fires behave. They studied that. They reviewed videotapes on it. I want you to go back to that, but just to clear up. Sure. The purpose of this fast burn conclusion was to suggest an incendiary. Well, what it was, Your Honor, as was discussed a little bit earlier, the purpose of it was to help the jury understand that if the first witnesses see this fire, see this building, this mammoth, huge building, fully engulfed in flames at 9-11 p.m. And Mr. Dixon says, depending on which version you believe, he left somewhere around 8, 8-30. The primary purpose of the testimony was to show that that fire was burning when he was still at the building or shortly after he left, which is one factor that can go to whether or not he- But that would be true if it's a slow burn, right? He would have been there as it was slowly getting started. Well, as the district court points out, Your Honor, I suppose theoretically that's true. I think both these gentlemen said that's highly unlikely due to the fact that there were seven smoke detectors in the home and there was testimony to that effect. But standing alone, Your Honor, as the district court said in a vacuum, this one particular piece of evidence may not have been the end-all, be-all. But it's one piece of the puzzle of all of the other circumstantial evidence. I mean, to me, it's highly relevant that, you know, if this gentleman is here when this fire is burning and then you take that into consideration, view it in the totality with everything else, it becomes very significant. So, you know, the argument that's advanced is that Judge Harpool was confused. And as you read his opinion, there's elements of it that look an awful lot like, and you read the transcript, there's questions and stuff. It kind of looks a lot like a Frye analysis in some ways. And if you start looking at Frye, you know, that was the Missouri law until 2017. And then there was an amendment to the statute. And so it's a relatively recent phenomena. Would you please address the argument that the judge was confused and applied some standard other than Daubert? Yes, Your Honor. Well, I, you know, again, I respectfully disagree with Mr. Endicott that he was confused. No surprise there. Well, of course. Yeah, no big shock. I understand. But what the judge does cite Daubert Como and its progeny in that opinion, and he talks about, you know, if I recall correctly, how observation, you know, he mentions Hickerson, he mentions Shook. He says, you know, observations coupled with expertise may be the only basis for an expert's opinion. I mean, he hits that dead on the head in that opinion. I think he's, you know, very well aware. And, of course, he's citing, you know, he sets out the full body of Rule 702, Your Honor, right in his order, and then, you know, runs through. Now, he focused, of course, on the methodology. I'm prepared this morning, if we need to, to speak to each prong of Rule 702. But he focused on the methodology. And, you know, I think the answer to your question, Judge, is his focus on the Hickerson, on the Shook, and the judge, to me, had a very clear understanding that really, frankly, testing isn't even necessary. I mean, there are many occasions, especially in these fire situations, Your Honor, where, you know, by the very nature of it, all of the physical evidence, you know, that these guys need to look at burns up in the fire. That's the problem with these things. What about the claim, though, that they didn't use the body of scientific knowledge? They were just using their own subjective knowledge and opinions. Well, I don't think that that's correct, Your Honor, because, I mean, it's… Well, again, that kind of gets back to what I was addressing before in terms of the foundation that I laid. And, you know, they talked about… You said you laid a foundation, but you didn't say what it was. Well, okay, and I was starting to get into it. I apologize. But I took them through all of their, first of all, all of their education, exactly, you know, what courses they had taken, what they had studied, the seminars that they had been to, the training that they had had, the live burns that they had observed and witnessed, their on-the-job experience, how many fires that they had worked, you know, how many times that they had… All right, so it's their personal background and experience, but the counterargument is that he had to be analyzing it by reference to the body of scientific knowledge greater than their own personal experience. But what I would say, Your Honor, is that all of those things that I just mentioned, that is the greater body. I mean, any time you go to, for example, an IAAI seminar, they are learning about the larger body of experience and science. That's what all of that is. It's them taking in, you know, the relevant body of knowledge and bodies. It's not just their own. I mean, if all these guys said was, you know, here's what I've done. I've gone out and I've worked these fires and here's what I've seen, then I would understand what you're saying. But that's not the case. I mean, these guys have said, you know, I've had an opportunity to participate in all of these industry, you know, courses and training and things of that nature over the many, many years and see what the industry and the, you know, the collective, you know, body of experts, what they're doing, what they're studying. So I don't think it's subjective. Hold on. But doesn't that have to be specific to the speed of a burn as opposed to 500 other things that are relevant? Well, and I ask those very questions, Your Honor, to make certain of that. I mean, this one we really honed in on, you know, what part of your education, what part of your training, what part of your experience focused on fire growth and fire spread. So I'm not talking about a class where they learned about, you know, how to test for accelerants or something like that. You know, I mean, much of what Mr. Endicott talks about when he says, well, they didn't sift and they didn't test for accelerants and didn't examine appliances and those sorts of things, that all goes to, you know, what you would typically expect to see if someone's attempting to determine the origin and cause of a fire. That's very different than a flame spread analysis. But isn't— Fire growth analysis. Isn't flame spread and fire growth analysis affected by other things that could be revealed in physical examination? Things like dry rot, things like termite damage. This is an old building. It's wood frame. It's been sitting there forever. And without those sort of underlying testing, doesn't it become speculative? What is there left to test, Your Honor, though, if the thing is reduced completely to rubble? That's the reason for the foundation that I laid. You know, when you look at what these gentlemen reviewed, pre-fire photographs of the building, Mr. Dixon had shot a video of the building where he goes room by room. You know, what are the fuel loads in each room? What are the walls made of? What are the floors made of? What are the ceilings made of? When I took the sworn testimony, I made very sure to ask them exactly those questions and then provided to Mr. Wysong that information so that he could address what you're talking about there, Your Honor. And when the place is reduced to dust and rubble, then that's the best that you have. So that gets to the 702A, which is the gathering of the sufficient facts and data with regard to this particular situation. So, again, on this issue, 702A, there's a multitude of information that they gathered and collected. In 702B, you know, that kind of gets to your question, Judge Colton, about, you know, what's the . . . This testimony, the opinions of these gentlemen, would assist the trier of fact, in my mind, to understand the significance of the timeline here, that if this building is, you know, fully engulfed in flames at 9-11 p.m. and Mr. Dixon leaves somewhere between 8 and 8-30, the testimony regarding, you know, how long that fire had been burning, that helps them, you know, if they choose to believe it, put Mr. Dixon at the scene of that place when it's on fire, which gets right to . . . It helps them to determine the central fact and issue, which is, you know, did he intentionally set this fire or not. I talked about 702B with the collection of the facts, the data. We've discussed the methodology. And, again, I just think the law in the Eighth Circuit is very, very clear that observations coupled with expertise, and that's essentially . . . that's what we have here. I don't think Judge Harpool was confused at all on that issue. Unless there's any other questions on that, I'll move along from the methodology aspect of it. The relevancy, I haven't discussed yet, but there was an objection based upon the relevancy. Well, to me, again, if you look at Rule 401, does this testimony tend to make a fact more probable or not? Well, it gets right back to what I just said. If the testimony shows that Mr. Dixon was at the building when it was on fire, that tends to make it more probable that he intentionally set . . . that he had the opportunity to set the fire. I'm still a little confused about that. Sure. Because if it was a slow burn, he still would have been there.  I think really what you're trying to do is do a backhand way of getting to incendiary. Well, and as I said, the primary purpose of it was to establish that . . . Well, but see, I'm not sure that I agree with you, Your Honor, and here's why. If it's a slow burn, this building . . . the thrust of this testimony is that this building would not have progressed, that fire would not have progressed to the state that it was at when it was first discovered at 9-11 p.m. If you're talking about a slow smoldering, we have an electrical arc inside of a wall, and these guys talked about how the progression of that kind of fire is very different than what we had here. So even if he had been there, Your Honor, you wouldn't have seen the fire progress to the state that it was in by the time it was first detected. So the point isn't whether or not he's there. Well, it's two things. I don't disagree with you, Your Honor. I mean, it's opportunity. It goes to opportunity. I mean, if he's right there at the building when it's on fire, then yes, he had the opportunity to set that fire, and that's one piece of the circumstantial puzzle. Now, the other aspect of this, though, and I think it gets more to what you're saying, Your Honor, is that if you have rapid, excessive, abnormal, unnatural fire growth and flame spread, the testimony was that can be an indicator of an incendiary fire, and that testimony and opinion did come out as well. All right. Thank you for your argument, Mr. Brady. Thank you. Mr. Endicott, we'll hear from you in rebuttal. Thank you, Your Honor. First of all, as far as the qualifications, the testimony with regard to rapid growth, their experience in rapid growth or whatever, came up during their qualifications, and Judge Harpool specifically understood it to apply just in general to their qualifications, not to the specific incident which happened in this case. I would say that if Wysong and Decker go to a conference and they come back, they cannot just testify concerning their experience without saying, okay, there was research that I found at this conference. This research is following. This is the book. This is the thing that I'm relying on so that people can then cross-examine on that information. That was not brought back and put into this case if, in fact, they actually found any kind of scientific research or principles that supported their theories. Mr. Noah, by the way, his purpose to testify was different. His purpose was to critique Mr. Wysong and Mr. Decker. Let me say something quickly about Hickerson and Shuck. I believe that Mr. Brady referred to that. Hickerson, Russell, Shuck, they are distinguishable because those experts did not claim to test. They did not claim to test using an errant definition of deductive reasoning, and they did not claim to engage in the process of ruling in, ruling out, causes when causation could not be determined and when their ultimate conclusions or hypotheses did not relate to causation. Finally, with regard to the mortgage, that issue, the issue of recoupment was stated in the complaint. It was stated in the amended complaint. I don't think this is proper rebuttal. It wasn't argued in the first round. Your time has expired anyway, but we have the briefs on that issue, and so we'll take a careful look at it. Thank you, Your Honor. Thank you. Thank you both for your arguments. The case is submitted, and the court will file an opinion in due course.